**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  LKG-22-0291** |
| | : | |
| **MATTHEW C. BROWNDORF,** | : | |
| | : | |
| **Defendant.** | : | |

---

**DEFENSE RESPONSE TO GOVERNMENT SENTENCING MEMORANDUM (ECF 63)**

The Defendant filed a lengthy sentencing memo under seal as ECF 62, which anticipated many of the arguments set forth by the government in its sentencing memo, filed as ECF 63.  The defense files this response to highlight a few omissions in the government's factual and legal analysis.

> **I.      Government's Credits Against Loss Argument Flawed.**

The parties disagree on whether the Credits Against Loss application note applies in this case, which is the sole basis for the dispute as to whether there is a 14-level or 16-level increase to the offense level based on loss.  The government's argument relies on a significant factual omission but also hews too literally to the language of Guidelines Section 2B1.1 application note 3(D), *Credits Against Loss*.

> **A.      Government's Analysis is Based on a Significant Factual Omission.**

The government contends that the Credits Against Loss reduction does not apply because "the money returned comes directly from BP Fisher client funds, rather than from the Defendant." ECF 63 at 18.  This overlooks the filings of the Bankruptcy Trustee in the BP Fisher Bankruptcy, pleadings which make clear that Mr. Browndorf caused $4 million to be turned over by Plutos

Sama Holdings, his company not in bankruptcy, to the Trustee so the Trustee could pay a lien at Pacific Premier Bank "so the $3.4 million could be turned over to the Trustee and used to make distribution to Debtor's former clients on account of their trust fund claims."  ECF 62 at 17-18, 33-34 (citing to ECF 146 at 4, *In re: BP Fisher Law Group, LLP*, Case No. 19-bk-10158-TA (C.D. Calif. Oct. 31, 2019).  Thus Mr. Browndorf did, in fact, provide non-trust fund money that enabled the Trustee to disburse funds to Seterus, Ditech and Select Portfolio Servicing ("SPS"), the three victims in this case.

Furthermore, the government's contention does not appear to be rooted in the application note, which addresses "money returned . . . by the defendant . . . to the victim."  Definitionally, funds "returned" to BP Fisher clients are BP Fisher client funds.  While it is possible for a defendant to make a victim whole with substitute assets, returning the actual property taken in the offense satisfies the plain language of the application note.

**B.      Government Is Too Literal in Its Reading of the Application Note**

The government advances an overly literal reading of the temporal requirement in the Credits Against Loss application note.  As the government acknowledges, the date on which Mr. Browndorf knew or reasonably should have known his offense was detected is August 16, 2022. ECF 63 at 16.  As explained above, by July 2019, Mr. Browndorf had taken all necessary steps to make $3.4 million in client trust funds available to the bankruptcy estate.  This was a continuation of his efforts to repay Ditech and SPS prior to the BP Fisher bankruptcy.  The government argues that Mr. Browndorf should not receive credits against loss because the bankruptcy trustee did not disburse payment to the victims until August 29, 2023.  ECF 63 at 16.  But the operative date should be when Mr. Browndorf made the money available to the Trustee to pay the victims, ***not*** the date the Trustee was authorized by the bankruptcy court to make the disbursement, which was

out of Mr. Browndorf's control.  The Trustee's distribution of the $3.4 million to 28 entities, rather than just the three clients for whom they were intended, illustrates that Mr. Browndorf had no further control of the funds after July 2019, including over the date on which they were ultimately distributed.

Cases cited by the government in which courts have rejected credits against loss based on the temporal element illustrate why Mr. Browndorf's situation is materially different from those defendants.

In *United States v. Merriman*, 647 F.3d 1002, 1004-05 (10th Cir. 2011), the defendant turned himself in to the government for an otherwise undiscovered offense.  At the time he did so, he relinquished assets to the government which the government subsequently liquidated and returned to victims.  While the credits against loss provision arguably *should* be broad enough to cover that scenario, it is not.  The crucial difference is that Merriman acted *at the time* his offense was discovered, not before, as Mr. Browndorf did.  The *Merriman* court's observation that a defendant who returns funds to victims post-discovery has "motivation to use his ill-gotten gains as leverage," *id.* at 1005, is plainly inapplicable to Mr. Browndorf, who took all necessary steps for the funds' return more than three years before he was indicted.

In *United States v. Austin*, 479 F.3d 363, 371 (5th Cir. 2007), the defendant argued that merely *filing* for bankruptcy prior to discovery of the offense allowed funds that he later repaid or pledged to the estate following discovery of the offense to "relate back" to the filing date.  This is not at all Mr. Browndorf's contention in the instant case, where he took all steps to make the trust funds available to the estate before discovery of the offense.

*United States v. Swanson*, 87 F. App'x 112, 124 (10th Cir. 2004), merely distinguishes a check-kiting case in which the defendant happened to have separately pledged collateral to the

3

same bank from the line of cases in which a bank's loss on a fraudulently obtained loan is offset by the collateral pledged for the loan. And *United States v. Mardirosian*, 602 F.3d 1, 12 (1st Cir. 2010), addresses the entirely separate question of whether a theft offense is discovered at the time the property (in this case, a painting by Cézanne) goes missing, or at the time the identity of the thief becomes known.

The government next argues that Mr. Browndorf did not "cause the returns" of funds because it was the bankruptcy Trustee who made the disbursements. This, once again, is an overly literal reading of the application note. Mr. Browndorf took definitive action which resulted in a substantial portion of the client trust funds being returned to Ditech, Seterus, and SPS. Nothing in the Guideline text suggests that the bankruptcy estate and Trustee serving as conduits for the funds negates the credit.

Neither of the cases cited by the government on this point are apposite. Mr. Browndorf is not claiming that he is "entitled to a credit for *any* recovery made by the bankruptcy trustee," *United States v. Neuman*, 2013 WL 6493096, at *5 (D. Or. Dec. 10, 2013) (emphasis added), nor is he attempting to "benefit from the return of funds detected and retrieved largely by the efforts of a defrauded party." *United States v. Dowl*, 619 F.3d 494, 504 (5th Cir. 2010). Rather, Mr. Browndorf is entitled to a credit for funds that *he* made available to the bankruptcy estate specifically for the Trustee to be able to return funds to Ditech, Seterus and SPS.

Finally, even if the Court determines that the Credits Against Loss application note is technically inapplicable, the fact that three years before he was indicted, Mr. Browndorf had Plutos Sama Holdings, which he controlled, provide the bankruptcy Trustee with $4 million to pay off a lien at Pacific Premier Bank to free up $3.4 million of client trust funds to pay back Ditech, Seterus

and SPS is highly mitigating.  Indeed, it should guide the Court's assessment of the nature and circumstances of the offense, and what constitutes just punishment under § 3553(a)(2)(A).

## II.       Government Correctly Takes the Position that SLS Is Not a Victim

While not contending that Specialized Loan Servicing, LLC ("SLS") is a victim in this case, the government nonetheless argues that "the Court should consider the harm [to] SLS as well as the other BP Fisher creditors in fashioning an appropriate sentence." ECF 63 at 29.  This is incorrect.

The government was correct to step away from any contention that SLS is a "victim" whose losses should be counted toward guideline loss or restitution.  ECF 63 n.1.  Application Note 1, Definitions, to Guideline Section § 2B1.1 provides that:

> "Victim" means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense. "Person" includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies.

"Actual loss" as defined in § 2B1.1(b)(1) table note C(i) "means the reasonably foreseeable pecuniary harm that *resulted from the offense*."  (Emphasis added.)  SLS could only be a victim if there were a causal nexus between pecuniary harm SLS suffered and the criminal offense for which Mr. Browndorf is being sentenced.  It is not sufficient that SLS might have a breach of contract claim against Mr. Browndorf or one of his companies, or that it was a creditor in the BP Fisher bankruptcy.  SLS would only be a § 2B1.1 "victim" if Mr. Browndorf's crime caused it harm. That did not occur.

First, it is not clear from SLS's submission that it contends SLS funds ever passed through the Maryland IOLTA accounts. Absent any evidence they did so, any claim to victim status ends there.   Pecuniary  harm  must  result  from  "the  offense"—here,  a  wire  fraud  scheme  to misappropriate funds from Maryland IOLTA accounts at PNC Bank and Wells Fargo.

Second, as recounted in detail in the Defense Sentencing Memorandum, Mr. Browndorf's and his entities' relationships with SLS were fundamentally different from those with Ditech, Seterus and SPS. *See* ECF 62 at 29-31.  SLS was utilizing BP Fisher to foreclose upon properties in the RBSHD 2013-1 trust.  DCM, a Plutos Sama-owned company, was the primary note holder and controlling shareholder of that trust and was, therefore, the principal beneficiary of these foreclosure sales.  Mr. Browndorf therefore had a good-faith basis to believe that the net proceeds from the foreclosures performed by BP Fisher for RBSHD 2013-1-owned properties were going back to DCM, which Mr. Browndorf controlled.  This was particularly true because Mr. Browndorf had negotiated internally with his limited partners in DCM subsidiaries to absorb any financial losses from BP Fisher into the RBSHD 2013-1 trust.  And even more so because the majority owners of the RBSHD 2013-1 trust had terminated SLS (along with Statebridge) in favor of self-servicing the RBSHD 2013-1 loans.

SLS's submission advances the theory that Mr. Browndorf or his entities lacked authority to terminate SLS as servicer of the RBSHD 2013-1 loans, and that his assertion of this authority was "fraudulent" and done for an improper purpose.  But the intricacy of this theory only underscores the complexity of the business relationships at issue, in which both the foreclosure law firm and the ultimate majority beneficiary of the RBSHD 2013-1 loan foreclosures were both Plutos Sama-related entities, giving Mr. Browndorf a good-faith reason to believe he had both the power to fire SLS and Statebridge as servicers (an action that Statebridge accepted), and the right to the foreclosure proceeds.

Even assuming *arguendo* that Mr. Browndorf's belief was incorrect as a matter of contract law, his good-faith basis for that belief negates any criminal intent in his directing monies from the sale of RBSHD 2013-1 loans to other purposes.  By contrast, Mr. Browndorf has acknowledged

criminal culpability for misdirecting proceeds from foreclosures on loans serviced by the three actual victims—Ditech, Seterus, and SPS. BP Fisher's foreclosure work for these victims involved foreclosing on properties in which Mr. Browndorf's entities held no financial interest. He therefore could not have believed in good faith that he was entitled to the net proceeds, and he has admitted as much through his plea of guilty. He should be appropriately punished for the losses he caused to Ditech, Seterus, and SPS through his crimes of conviction—under the United States Sentencing Guidelines, he may not be punished for what amounts to a good-faith business dispute with SLS.

For these same reasons, the Court should not increase Mr. Browndorf's sentence under the § 3553(a) factors for this good-faith business dispute with SLS—it simply has no bearing on any purpose of sentencing articulated in that statute.

**III.     Government Argument for Consecutive Sentence Oversimplifies the Analysis.**

The Court should impose a concurrent sentence notwithstanding the government's arguments to the contrary. The defense is asking the Court to impose a 60-month sentence from October 12, 2023, concurrent to the 48-month sentence that Mr. Browndorf is already serving, which will result in Mr. Browndorf serving more time in custody than he would have based on the Wisconsin conduct alone. A concurrent, albeit incrementally higher sentence, is appropriate given that the cases involve relevant conduct, and the guidelines contemplate a way of coming up with a combined offense level in situations such as this one.

The government points to the remark by the sentencing judge in Wisconsin that he was "not taking into account the fraud charges that remain pending in the District of Maryland." ECF 62-4 at 31:1-5. But in order to arrive at the tax loss he calculated, he necessarily included tax losses across all Plutos Sama related entities—not just BP Peterman, the Wisconsin-based law firm

giving the court jurisdiction.   And in ordering restitution for failing to make contributions to employee benefit plans, he made restitution payable to "Former Employees of Plutos Sama," Judgement at 6, ECF 32, *United States v. Matthew Browndorf*, Crim. Case 22-cfr-0252-JPS (E.D. Wis. Nov. 30, 2023).   Thus, the sentence in Wisconsin was for conduct beyond financial improprieties at BP Peterman.   Nonetheless, the defense is not asking the Court to impose a sentence that would mean Mr. Browndorf did no additional time for the events in Maryland. Rather, the defense is seeking an incrementally higher sentence—a request based in the Guidelines, which addresses the Wisconsin judge's concerns.

The defense maintains that the Wisconsin and Maryland cases are relevant conduct to one another, whereas the government argues that the Wisconsin and Maryland cases should not be treated as relevant conduct under Guidelines Section 1B1.3 for purposes of § 5G1.3(d).   In its analysis under Guidelines Section § 1B1.3 Application Note 5(B)(i), the government argues the cases are not "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi."   The government is mistaken.

*Victims.*   The government asserts that the victims in the Wisconsin Case were employees of Plutos Sama entities whereas the victims in this case were BP Fisher's servicer clients.   That is true as far as it goes, but the principal victim in the Wisconsin Case was the IRS, and as just noted the tax loss included BP Fisher and other Plutos Sama entities.   The defense acknowledges that there are different victims, but, as the Defense Sentencing Memo explained, the guidelines do not require a consecutive sentence as a result.   To the contrary, the guidelines state that when there are different victims, the conduct does not group.   *See* U.S.S.G. § 3D1.2(a) (explaining that "All counts involving substantially the same harm shall be grouped together in a single Group.   Counts involve

substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction….").  As a result of the grouping, the guideline range increases incrementally.  The way to handle different victims is by applying Chapter 3 of the guidelines, not be jumping to a consecutive sentence.

As explained in the Defense Sentencing Memorandum, ECF 62 at 43-44, the Court should consider the Wisconsin Case to be one group for guidelines purposes and the District of Maryland case another group for guidelines purposes:

<table>
<tr><td colspan="2">Eastern District of Wisconsin<br>26 U.S.C. § 7202 Offense<br>(Group One)</td><td colspan="2">District of Maryland<br>18 U.S.C. §§ 1343 & 1957 Offenses<br>(Group Two)</td></tr>
<tr><td>Base Offense Level, § 2T1.6</td><td>24</td><td>Base Offense Level, § 2B1.1</td><td>7</td></tr>
<tr><td>Role in the Offense, § 3B1.1(c)</td><td>+2</td><td>Loss, § 2B1.1(b)(1)(H)</td><td>+14</td></tr>
<tr><td>Acceptance of Responsibility, § 3E1.1(a) & (b)</td><td>-3</td><td>Sophisticated Means, §2B1.1(b)(10)(C)</td><td>+2</td></tr>
<tr><td>Adjusted Offense Level</td><td>23</td><td>Money laundering, § 2S1.1(b)(2)(A)</td><td>+1</td></tr>
<tr><td></td><td></td><td>Special Skill, § 3B1.3</td><td>+2</td></tr>
<tr><td></td><td></td><td>Acceptance of Responsibility, § 3E1.1(a) & (b)</td><td>-3</td></tr>
<tr><td></td><td></td><td>Adjusted Offense Level</td><td>23</td></tr>
</table>

The Court should then use Guidelines § 3D1.4 to generate a combined offense level.  Each Group would be 1 unit so the Court would add two levels to 23, yielding a combined total offense level of 25.  *See* U.S.S.G. § 3D1.4(a).

The government asserts that this argument is procedurally waived, ECF 66 at 3, even though the paragraph 9 of the plea agreement expressly stated: "The Defendant reserves the right

9

to argue that any sentence imposed should run concurrently with the sentence imposed in *United States v. Matthew C. Browndorf*, 22-cr-252 (E.D. Wis.)," just as "The Office reserves the right to argue that any sentence imposed should run consecutively to the sentence imposed in *United States v. Matthew Browndorf C. Browndorf*, 22-cr-252 (E.D. Wis.)."   The government does this by relying on the guidelines, so, too, does the defense.  Both parties are looking to § 5G1.3 and what constitutes relevant conduct under § 1B1.3.  The defense has accepted the guidelines for the Maryland case agreed to by the parties.  The defense is arguing that Chapter 3 of the Guidelines Manual provides a way for the Court to think about what the concurrent sentence should be under § 5G1.3, the provision relied upon by both parties, once it determines that the two cases are relevant conduct to one another. Ironically, the government's waiver argument is essentially complaining that the defense is requesting a sentence higher than what the guidelines would otherwise call for if the Court accepts the defense position on Credits Against Loss and that the Wisconsin Case should not receive criminal history points.  (Offense level 23 at Criminal History Category I yields a range of 46-57 months, and the defense did object to the PSR assigning criminal history points to the Wisconsin case.  *See* PSR at 28.)  Rather than argue that the Court should impose a concurrent sentence at the bottom of the most advantageous guidelines range, the defense has tried to provide a framework for coming up with the appropriate concurrent sentence.  The plea agreement allowed the defense to ask for whatever sentence it wanted under § 3553(a), and, as such, there is nothing barring the defense from looking to the principles behind the guidelines in undergoing the § 3553(a) analysis to explain how the defense arrived at a recommendation of 60 months from October 12, 2023, concurrent to the Wisconsin case.

*Common Accomplices.*  The government acknowledges that Plutos Sama staff moved money at Mr. Browndorf's direction.  While they are not "accomplices" in the sense that they are

not co-conspirators, there is no question that the same staff members at Plutos Sama were involved in the movements of money at both BP Peterman and BP Fisher.

*__Common Purpose/Similar Modus Operandi.__*   The government contends that "in the Eastern District of Wisconsin case, the Defendant enriched himself by stealing from his employees and not paying his taxes, whereas in the instant case, the Defendant enriched himself from stealing from BP Fisher's clients."  ECF 63 at 33.  This is too narrow of a framing of "Same Course of Conduct or Common Scheme or Plan" in Application Note 5(B) to USSG § 1B1.3.  In fact, both cases involved substantially the same purpose and modus operandi: misdirecting funds that were legally required to stay in specific "buckets" (taxes, pension and health plans, client disbursements) in order to pay for other Plutos Sama business expenses and personal expenses.  Moreover, "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  Appl. Note 5(B)(ii).  As the lengthy Factual Background to the Defense Sentencing Memo explains, there is no question that the financial improprieties at BP Peterman and BP Fisher were part of a "single episode, spree, or ongoing series of offenses," when Mr. Browndorf was trying to keep Plutos Sama and its subsidiaries afloat while managing personal expenses.  The government concedes as much when it argues that in the Eastern District of Wisconsin case, money owed to the IRS went instead to pay some of his personal expenses—the same thing it argues happened in Maryland.

On the related issue of criminal history category, the government speculates that, had the BP Peterman and BP Fisher conduct been charged in a single indictment, Mr. Browndorf would have sought a severance.  Even had he done so, and even if the court had granted the motion, the

11

fact that charges may be severed for trial does not mean that the resulting convictions will not be

disposed of through a single sentencing proceeding, at which Mr. Browndorf would have been

Criminal History Category I.  Moreover, such a motion would likely have been denied because the

conduct in both cases was "connected with or constitute[d] parts of a common scheme or plan."

18 U.S.C. § 3363; Fed. R. Crim. P. 8(a).

The government asserts that "tellingly, the Defendant did not seek a global resolution for

the two indictments," but that is an unfair characterization of the facts.  As stated in Mr.

Browndorf's sentencing memo:

> The assigned judge in the Eastern District of Wisconsin set a schedule long
> before one was set in the District of Maryland.  As the Assistant United States
> Attorney in the Eastern District of Wisconsin was pushing for a pretrial resolution,
> the then-assigned Assistant United States Attorney in Maryland reached out to
> defense counsel in Maryland about the possibility of an imminent resolution in
> Wisconsin.  Undersigned expressed an interest in a global resolution, but at that
> time, government counsel in Maryland was seeking very different guidelines from
> the eventual plea agreement entered into by the parties and, thus, a global resolution
> could not be reached at that time.  Furthermore, neither U.S. Attorney's Office
> seemed willing to transfer its case to the other under Federal Rule of Criminal
> Procedure 20.

ECF 62 at 23.

Finally, the government's reliance on the Wisconsin Case in its analysis of the § 3553(a)

factors is telling; it is asking the Court to consider that case in sentencing Mr. Browndorf on the

instant case.  By doing so, the government is proving Mr. Browndorf's point: the Court should

consider the cases together and should determine an appropriate aggregate sentence for both cases,

achieved as counseled by U.S.S.G. § 5G1.3(b): via a concurrent sentence and a downward

adjustment to reflect time already served that the BOP will not credit.  *See* ECF 62 at 44-46.

IV.    **The Government's 3553(a) Analysis Ignores Mitigating Facts.**

The government's request for a 71-month sentence ignores inconvenient facts in its analysis. For example, it asserts that Mr. Browndorf used IOLTA funds "for personal expenses," *see* ECF 63 at 3, ignoring that in the statement of facts to the plea agreement, which the government wrote, it acknowledged that the misappropriated IOLTA funds were used "to pay off personal ***and business expenses***." Plea Agreement at 12. The prosecution's § 3553(a) analysis rests on the assertion that Mr. Browndorf committed the crime "to enrich himself," *id.* at 20. But as the Statement of Facts to the Plea Agreement and Factual Background section of the Defense Sentencing Memo explained, a significant amount of the misappropriated funds were used to keep the various Plutos Sama entities afloat. The government's § 3553(a) analysis ignores these mitigating details. For example, the government has a paragraph dedicated to the movement of IOLTA funds to different banks to secure favorable treatment, implying it was favorable treatment for Mr. Browndorf. But as the Statement of Facts to the Plea Agreement makes clear, this was not for favorable treatment for Mr. Browndorf but rather "'favorable treatment' from City National Bank and to generate business for Browndorf's California operations." Plea Agreement at 14. Later that money was moved to Pacific Premier Bank "[t]o obtain a short-term working capital loan for BP Fisher." *Id.* Thus, the statement of facts written by the government acknowledges what the government now finds to be inconvenient: Much of what Mr. Browndorf did was to keep his various businesses afloat. While Mr. Browndorf benefited from the survival of his businesses, so too did the employees and investors.

The government characterizes Mr. Browndorf as a "serial fraudster." ECF 63 at 26. It quotes from Judge Sullivan, and in describing the October 12 and 16 detention hearings, the government notes Judge Sullivan's skepticism of Mr. Browndorf's employment found shortly

before the hearing.  But the government ignores that Pepe Dela Vega, the employer, flew to

Maryland from California and appeared for the October 16, 2023, hearing to verify Mr.

Browndorf's employment with the Nonprofit Alliance.  Exhibit 15 to the Defense Sentencing

Memo is a letter from Mr. Dela Vega explaining that the information that Mr. Browndorf was able

to teach his staff in the brief period of his pre-detention employment has resulted in "a 268%

increase in postponement of last-minute imminent Trustee Sale Auctions for new clients."  ECF

62-15 at 2.  The government relies on Judge Sullivan's cynicism, which, at least with regards to

Mr. Browndorf's employment at the Nonprofit Alliance was misplaced.

In arguing 71 months is necessary as a specific deterrent, the government just cites a couple

cases for general propositions about deterrence.  The government does not acknowledge the utter

devastation of Mr. Browndorf's life.  As explained in the Defense Sentencing Memorandum, Mr.

Browndorf has lost everything—not just his freedom: his minor child, his adult daughter, his

marriage, all his assets, his reputation, his law licenses, the ability to care for his sick parents and

he is significantly burdened by debt.  The government cannot provide any fact-specific basis to

argue that after a 60-month sentence and a period of supervised release, Mr. Browndorf would

reoffend.

The government's general deterrent argument is similarly unavailing.  The government

cites several cases for the proposition that general deterrence should be a sentencing consideration

in fraud cases.  But the sentence the defense is requesting is a far cry from the probationary

sentence that caused the Eleventh Circuit to focus on the need for general deterrence in white-

collar cases in *United States v. Howard*, 28 F.4th 180 (11th Cir. 2022), or one-day sentence the

Sixth Circuit decried in *United States v. Musgrave*, 761 F.3d 602 (6thh Cir. 2014), or the seven-

day sentence reversed in *United States v. Martin*, 455 F.3d 1227 (11th Cir. 2006).  In addition to

the five-year prison sentence the Defense is seeking, the wreckage of Mr. Browndorf's life serves

as a cautionary tale to any lawyers of the risks of raiding IOLTA accounts to pay business and

personal expenses or not paying over taxes or contributions to employee benefit accounts.  This

case shows that even if you have the intent to return the funds—and largely do pay back your

clients—the consequences are incredibly severe.  Five years from the date he was first detained

(October 12, 2023) and concurrent to his Wisconsin sentence sends a crystal clear specific and

general deterrent message.

## CONCLUSION

For the reasons stated in the Defense Sentencing Memo, in this responsive pleading, and

at the hearing scheduled for December 19, 2024, the sentence called for by the U.S. Sentencing

Guidelines and § 3553(a) is 60 months from October 12, 2023, concurrent to the Wisconsin Case

sentence.  Because the Bureau of Prisons will not give Mr. Browndorf credit toward his Maryland

sentence for time in custody until the date it is imposed (because the time he has been in custody

since October 12, 2023 (14 months and 7 days) has been credited toward the Wisconsin sentence,

s*ee* 18 U.S.C. § 3585) to effectuate an aggregate sentence of 60 months from October 12, 2023,

the Court must impose a sentence of 45 months and 23 days to begin immediately and run

concurrent to the sentence previously imposed in Eastern District of Wisconsin Case No. 22-CR-

252-JPS.  To effectuate such a sentence, the Judgment should read:

> **Imprisonment for 45 months and 23 days, to run concurrent with the sentence in *United States v. Matthew Browndorf*, No. 2:22-cr-00252-JPS (E.D. Wis.). This sentence is adjusted downward from 60 months pursuant to U.S.S.G. § 5G1.3(b) for a period of imprisonment that will not be credited by the Bureau of Prisons: the 14 months and 7 days that Mr. Browndorf has served since October 12, 2023, on the Eastern District of Wisconsin sentence.**

Respectfully submitted,

JAMES WYDA
Federal Public Defender


             /s/
KATHERINE TANG NEWBERGER (#27803)
DOUGLAS R. MILLER (#18309)
Assistant Federal Public Defenders
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax:  (410) (410) 962-3976
Email:  katherine_newberger@fd.org
        douglas_miller@fd.org